CRIMINAL COMPLAINT - CONTINUED

I, Carlos Valles, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since April, 2009. I am an investigator and law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7) that is an officer of the United States empowered by statute in the United States Code, and the Colorado Statutory code. I am authorized under the Federal Rules of Criminal Procedure, Rule 41(a)(1)(C) as a Federal law enforcement officer who is engaged in enforcing the criminal laws, and is within any category of officers authorized by the Attorney General to request a search warrant. My primary duties consist of the enforcement of federal firearms and narcotics laws, including conspiracy to violate firearms and narcotics laws. Prior to becoming an ATF Special Agent, I was employed with the United States Border Patrol (USBP) as an Agent for approximately one (1) year. During my employment with the USBP, I was charged with the duty of enforcing the violation of Federal immigration, drug and firearms laws. While employed as an ATF Special Agent, I have conducted and participated in hundreds of Federal investigations.

## II. PROBABLE CAUSE

2. Based on the facts set forth in this affidavit, there is probable cause to believe that Jose Eduardo TRUJILLO, as well as other known and unknown co-conspirators, is engaged in violations of Title 26 U.S.C. § 5861(d), any person to receive or possess a firearm which is not registered in the National Firearms Registration and Transfer Record (NFRTR).

## III. SUMMARY OF THE INVESTIGATION

*A. Criminal Intelligence Information Received*

**CRIMINAL COMPLAINT - CONTINUED**

3.      On November 13, 2017, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) Special Agents (SAs) Carlos Valles and Alan Breneman received criminal intelligence from an ATF Confidential Informant [hereinafter referred to as "CI"], regarding Andres LUNA, who was believed to be distributing narcotics.

4.      The CI reported to SAs that on or about November 10, 2017, the CI met a male individual who introduced himself to the CI as "Buddha" at Dandy Dan's Club located at 214 S. Federal Blvd, Denver, CO 80219.  "Buddha" also told the CI that "Buddha" was a Sureño 13 gang member and that "Buddha" had been recently released from a five-year Federal prison sentence. "Buddha" was later identified as Andres LUNA and will be hereinafter referred to as LUNA.

5.      According to the CI, on November 10, 2017, the CI and LUNA began to engage in casual conversation while at the club.  During this conversation, the CI reported that LUNA admitted to dealing in kilogram quantities of cocaine.  The CI reported that LUNA was showing photographs of LUNA in prison.  The CI reported that LUNA told the CI that LUNA was currently employed as a barber.  The CI then affirmatively acknowledged LUNA'S claim regarding the distribution of cocaine and explained to LUNA that the CI's "boss" (an ATF undercover (UC) Special Agent) would be interested in purchasing cocaine.  However, the CI explained that he/she needed to contact his/her "boss," (a UC) because they pooled their money in order to purchase narcotics.  The CI further explained to LUNA that the CI's "boss" had a "shop," (an ATF controlled undercover (UC) location).

6.      On November 13, 2017, the CI reported that CI went to "Famouz FADEZ and TATZ," a barber/tattoo shop (1445 S. Sheridan Blvd., Lakewood CO).  The CI reported that LUNA was working in the barbershop.  The CI reported that while inside "Famouz FADEZ and TATZ", LUNA showed CI a small package of suspected cocaine.  CI reported that LUNA was waiting for

an unknown individual to pick up the suspected cocaine. CI further reported that CI and LUNA engaged in casual conversation and LUNA invited CI to meet later in the evening at Dandy Dan's Club.

7. Later on November 13, 2017, CI met with LUNA at Dandy Dan's Club. CI reported that LUNA was openly selling narcotics inside the club. CI reported that CI observed a large sum of cash in the possession of LUNA. CI reported that CI and LUNA discussed the purchase of two ounces of cocaine for two thousand dollars ($2,000.00). CI reported that LUNA told the CI that LUNA would sell ounces for one thousand dollars each, as long as the CI purchased at least two ounces. CI reported that CI overheard an unknown female appear to call LUNA by the first name of "Andres".

8. Between the dates of November 20, 2017 through June 15, 2018, CI exchanged several recorded phone calls and text messages with LUNA. The context of these communications revolved around LUNA's sales of narcotics and firearms. At the direction of ATF SAs, CI contacted LUNA via telephone and arranged a meeting for the purchase two (2) firearms from LUNA, on Tuesday, June 19, 2018.

9. Between the dates of June 19, 2018 and July 11, 2018, ATF undercover agents SAs 5115 and 3997 (UCs) conducted the controlled purchase of multiple firearms and multiple pounds of crystal methamphetamine from LUNA.

### B. *July 25, 2018 Undercover Controlled Purchase of Firearms and Silencers from Andres LUNA and Jose TRUJILLO*

10. On July 25, 2018, the UCs conducted an undercover controlled purchase with Andres LUNA and Jose TRUJILLO. The UCs purchased two (2) firearms, an unknown manufacturer, multi-caliber caliber rifle, with no serial number, along with one (1) silencer; and an unknown manufacturer, multi-caliber pistol, with no serial number, along with one (1) silencer, and one (1) Radical Firearms, Model RF-15, multi-caliber, semi-automatic rifle, bearing serial number:

3

**CRIMINAL COMPLAINT - CONTINUED**

RD18835. The controlled purchase was conducted at Artwork Auto, located at 844 E. 78th Ave., Denver, CO, in the Judicial District of Colorado.

11. Prior to the controlled undercover meeting, on July 24, 2018, CI engaged in recorded phone call communication with LUNA at (720) XXX-1320. During the call, CI asked LUNA if he/she could provide SA 5115 with LUNA's telephone number, so that SA 5115 could contact LUNA directly, to which LUNA permitted. SA 5115 then engaged in recorded phone conversations and text message communications with LUNA in order to confirm the meeting time and location. LUNA provided the address of 844 E. 78th Ave., Denver, CO.

12. On July 25, 2018, at approximately 2:06 pm, the UCs arrived at the front entrance of Artwork Auto and observed a green Ford Aspire, bearing CO license plate: 532ZMK (subsequently identified as being registered to Jose Eduardo TRUJILLO) and a white Lincoln LS, bearing CO license plate: LQD710. The UCs then exited the undercover vehicle (UCV) and entered the building where they made contact with a male individual (subsequently identified as Arturo Salcido). SA 5115 asked if LUNA was there and then another male (subsequently identified as Jose Eduardo TRUJILLO) answered that LUNA would be arriving "in a minute". TRUJILLO further stated that LUNA had notified him the UCs would be arriving and then instructed the UCs to pull around to the back garage entrance of the shop. After moving their UCV, the UCs observed Salcido leaving in a silver Chevrolet Suburban, bearing CO license plate: BEI991. TRUJILLO then waved for the UCs to pull the UCV into the garage area and closed the garage door after the UCs pulled in. TRUJILLO asked what problems the UCV had and SA 3997 explained that he did not really know that much about Audis and did not want to risk a breakdown on a longer trip. TRUJILLO acknowledged and told the UCs to hang out in the front waiting area of the building and wait for

**CRIMINAL COMPLAINT - CONTINUED**

LUNA (as he checked the UCV). The UCs then walked to the waiting area and waited for LUNA's arrival.

13. On this same date, at approximately 2:49pm, the UCs heard LUNA arrive through the back door entrance of the garage area. LUNA made his way towards the waiting area of the building where the UCs made contact with him. LUNA was carrying a black rifle case and directed the UCs into the front waiting area of the building, where he told SA 3997 to close the partition, which then blocked any view through the front glass door. TRUJILLO called the teenage male, who appeared to be his son, by the name of "Kenny," into the garage area. LUNA then placed the rifle case on the couch, opened it, retrieved the rifle and handed it to SA 5115, stating that it was a "300" and that he had "got it for cheap" for the UCs. LUNA stated that this firearm would normally sell for $1,000.00, however he was selling it to the UCs for $750.00. LUNA further explained that his "homie" gave him a Benchmade knife for being able to sell this particular firearm to the UCs. SA 5115 visually and physically examined the firearm and was able to observe the make and model of the firearm (Radical Firearms, model RF-15). SA 5115 handed the firearm to SA 3997 so that he could also visually and physically examine the firearm. LUNA referred to TRUJILLO by the name of "Jose," and called him over to where LUNA and the UCs were so that TRUJILLO could also examine the firearm. SA 3997 handed the firearm to TRUJILLO, where TRUJILLO visually and physically examined it. LUNA told TRUJILLO that the firearm had a switch so that it could be fully automatic. TRUJILLO advised LUNA that the firearm was just made like that and that it was not fully-automatic. TRUJILLO further stated that this firearm "shoots like a nine". SA 5115 asked LUNA if TRUJILLO was the person who makes the firearms. LUNA stated that TRUJILLO was not and then stated, "The homie that makes 'em don't wanna meet nobody."

CRIMINAL COMPLAINT - CONTINUED

14.     SA 3997 followed TRUJILLO to the garage area of the building, where SA 3997 observed TRUJILLO obtain a rifle case and a cardboard box from the area of a yellow Snap On tool box and tool cabinet along the east wall of the garage area.  TRUJILLO set the rifle case and cardboard box on a mechanic work stand and opened the black plastic rifle case and the UCs observed an AR-15 type rifle and AR-15 type pistol and two (2) boxes of 5.56 mm ammunition inside the rifle case.   TRUJILLO opened the white cardboard box, which the UCs observed had the markings, "Matrix Arms" on the outside of the box.  TRUJILLO removed a black metal silencer with no markings from the box and showed the silencer to the UCs.  TRUJILLO then handed it to LUNA.  TRUJILLO briefly walked back towards the area where he had retrieved the firearms and quickly returned, holding a second silencer with him.  This was a larger black metal silencer that appeared to have been manufactured from a black Mag-Lite flashlight.  He placed this silencer on the mechanic work stand for the UCs to observe.  TRUJILLO stated that this silencer was not painted yet, however that it went on the AR-15 type rifle.

15.     LUNA asked TRUJILLO how the silencers "go on" the firearms and TRUJILLO walked back to a tool box and the UCs could hear TRUJILLO rummaging through metal tools.  SA 5115 asked LUNA again if TRUJILLO was not "Danny" and LUNA confirmed, stating that TRUJILLO was "the other mechanic."  LUNA continued to show the UCs the firearms and TRUJILLO returned with multiple wrenches, which he set down near the firearms.  SA 5115 asked TRUJILLO if the second silencer TRUJILLO brought used to be a Mag-Lite.  TRUJILLO stated that it was, and he unscrewed one of the end caps so that the SAs could see what TRUJILLO stated were "baffles" inside of the tube.  TRUJILLO then attached the smaller, black metal silencer on the AR-15 type pistol and explained that the silencer would "fully" function with "subsonic ammunition".  LUNA added that "it shoots so hot, no matter what you do, it breaks the sound barrier".

**CRIMINAL COMPLAINT - CONTINUED**

16. TRUJILLO stated that the Mag-Lite silencer had a "twelve baffle system" and added that the AR-15 type rifle was a "ghost gun". SA 3997 then stated, "Yeah like those other ones, right?" referring to the "ghost guns" the UCs had previously purchased from LUNA. TRUJILLO replied, "Yeah, there's no marks on them, nothing… That's what…our friend does." TRUJILLO explained that the silencers were also interchangeable and further explained in reference to the firearms, that one could tell "he builds them out… 80%". LUNA moved to the front waiting area, so that he could sit down (for health reasons). TRUJILLO explained that the "best part" about firearms was that fact that they did not have "serial numbers". TRUJILLO added that the firearms were legal to own and stated, "you just have to tell em that you build em." TRUJILLO further stated that the silencers "are not" legal to own and that "if you wanna make em, you have to pay the $200.00 tax stamp." TRUJILLO added that was the reason he did not have the silencers attached to the firearms, specifically in the event he was "pulled over." SA 3997 and TRUJILLO then walked back towards the UCV, where TRUJILLO told "Kenny", to show SA 3997 a video of TRUJILLO shooting the AR-15 type pistol with a silencer attached to it on his phone. TRUJILLO stated that the video was taken in the basement of his residence, where he stated that he shot the AR-15 pistol with the silencer attached and no one was able to hear the pistol firing in the upstairs of the residence. TRUJILLO then showed SA 3997 the video, and SA 3997 observed TRUJILLO shooting the aforementioned AR-15 pistol with the attached silencer through a stack of books placed on a nightstand or end table in the basement of a residence.

17. Utilizing the pre-recorded, ATF Agent Cashier Funds U.S. currency/buy money, SA 5115 purchased the two (2) firearms, an unknown manufacturer, multi-caliber caliber rifle, with no serial number, along with one (1) silencer; and an unknown manufacturer, multi-caliber pistol, with no serial number, along with one (1) silencer, for $4,700.00. SA 3997 purchased one (1) Radical

7

**CRIMINAL COMPLAINT - CONTINUED**

Firearms, Model RF-15, multi-caliber, semi-automatic rifle, bearing serial number: 18835, for $750.00.

### C. August 29, 2018 Undercover Controlled Purchase of Firearms and Silencers from Andres LUNA and Jose TRUJILLO

18. On August 29, 2018, the UCs conducted an undercover controlled purchase with LUNA and TRUJILLO. The UCs purchased three (3) firearms; an unknown manufacturer, multi-caliber (.223/5.56mm) rifle with no serial number, an unknown manufacturer multi-caliber (.223/5.56mm) pistol with no serial number, and an Aero Precision Model X15 multi-caliber (.223/5.56mm) rifle, bearing serial number X155251. The UCs also purchased two (2) unknown manufacturer silencers with no serial numbers. The undercover controlled purchase was conducted at Artwork Auto, located at 844 E. 78th Ave., Denver, CO 80229, in the Judicial District of Colorado.

19. Prior to the controlled undercover meeting, beginning on July 26, 2018, SA 5115 and LUNA engaged in cell phone text message communication. The purpose of this communication was to arrange for the purchase of firearms, silencers and methamphetamine. SA 5115 and LUNA eventually agreed to meet at Artwork Auto, located at 844 E. 78th Ave., Denver, CO, on August 29, 2018, to conduct a transaction of two (2) firearms and one (1) silencer for $3,700.00 and one (1) pound of crystal methamphetamine for $4,000.00.

20. On August 29, 2018, at approximately 2:28pm, the UCs arrived at Artwork Auto in the UCV, driven by SA 3997. The UCs observed that there was silver Ford Taurus bearing Colorado license plate number MQX658 and a teal green Ford Aspire bearing Colorado license plate number 532ZMK parked in front of the business upon their arrival.

21. Once inside the business, the UCs greeted LUNA, who immediately started talking about his methamphetamine source and stated that the source was on his way to the shop, but

CRIMINAL COMPLAINT - CONTINUED

wanted to know for sure if the UCs still wanted the methamphetamine. LUNA further stated that the narcotics source had been ready to deliver methamphetamine to LUNA for the UCs on previous occasions when it didn't work out.

22. The UCs briefly left the front office area to move the undercover vehicle to the rear of the business and subsequently returned to the rear garage warehouse area of the business shortly thereafter, where they observed TRUJILO, Danny MAINUS, and another unidentified Hispanic male in the rear garage area of the business. The UCs were then introduced to MAINUS, who introduced himself as "Daniel", and who was working on a black Ford Mustang in the garage area.

23. SA 5115 asked LUNA if MAINUS was the individual making the firearms, and LUNA replied, "No, the other homey, cause he wanted to show you some other shit. Remember you said you want to see some fancy, fancy shit. He makes some fancy shit. He knows more what to say, to order."

24. LUNA waited for MAINUS and one of the two unknown Hispanic males, who was apparently a customer of the business, to walk out of the rear garage area business and then looked at TRUJILLO and said, "You ready? I don't know where you have them." TRUJILLO looked at a some grey lockers against the west wall of the garage/warehouse area and replied, "In the first one, no, the other first one, and on the top of the locker," and LUNA then subsequently opened one of the lockers and removed two soft black nylon cases containing firearms, and SA 3997 assisted LUNA in obtaining the third firearm from a black plastic hard case that was on top of the lockers. LUNA and SA 3997 then carried the firearms to a table in the rear garage area and put the firearms on the table for the UCs to examine.

25. The UCs both observed that the two black nylon soft cases contained two AR-15 type multi-caliber firearms, one rifle, and one pistol, with no additional markings, and one black metal silencer. The UCs also observed that there was an additional firearm, a customized AR-15

type rifle and a second silencer, in the black plastic hard case that were not previously discussed between LUNA and SA 5115 prior to the undercover contact. As the UCs began examining the firearms, LUNA stated that they needed to lock the front door of the business and move a screen in front of the window.

26. LUNA and TRUJILLO then began describing the firearms to the UCs. LUNA referred to the additional AR-15 type rifle in the black plastic hard case and stated, "These are the high end ones," and TRUJILLO stated, "Yeah, this is the top of the line. And for future, there's going to be a future, no caps, it's a muzzle break, right?" TRUJILLO then proceeded to show the UCs a custom machined muzzle break that could be screwed on to the end of a rifle barrel, that also had additional threading on the outside of the muzzle break so it could directly accept a silencer without additional modifications. TRUJILLO referred to the AR-15 type pistol in one of the black nylon soft cases and showed the UCs that the pistol had been modified with custom handguards to allow a silencer to be attached to the barrel so that the pistol would actually appear to be the length of a rifle when the silencer was attached. TRUJILLO showed the UCs how to remove the silencers from each of the other firearms and then interchange them with the other rifles and stated, "You can put it on this one and make it even shorter."

27. SA 5115 asked TRUJILLO how long it took him to make the firearms and how long it took to thread the barrels, and TRUJILLO stated that the barrels to the firearms were already threaded. TRUJILLO then stated, "On the new ones that he's working on, there's going to be this muzzle break up front, so instead of taking it off and taking it on, so that will be like that," and TRUJILLO then proceeded to thread a muzzle break that would directly accept a silencer onto one of the rifles. As TRUJILLO was describing the modifications on the custom AR-15 rifle to SA 3997, LUNA was handling the other AR-15 type rifle and placed a rifle magazine into the rifle and handed the firearm to SA 5115 and stated, "Modified AR, this one's a G ($1000.00), that one's a

nice one." TRUJILLO then stated, "On the new one's that he's working on, there's going to be this muzzle break up from, so instead of taking it off and putting it back on … everything's going to thread and you don't have to take anything off, but that's like the future."

28. TRUJILLO again referred to the custom rifle and stated, "Nickel boron on that one. This one's custom to the brim. If you notice this one doesn't have a dust cover or a forward assist." TRUJILLO also showed the UCs several boxes of rifle ammunition that were included with the firearms and explained that he used heavier bullets when shooting the rifles with the new customized muzzle breaks. LUNA stated, "Yeah when you said you wanted to see some fancy pretty stuff." SA 5115 and LUNA discussed the sale price for the firearms and silencers. SA 3997 briefly left the garage area of the business and went outside to drive the undercover vehicle up to the garage door of the business so the UCs could load the purchased firearms and silencers into the undercover vehicle.

29. Utilizing the pre-recorded, ATF Agent Cashier Funds U.S. currency/buy money, SA 5115 counted out $3700.00 and handed it to LUNA for the purchase of two (2) firearms: an unknown manufacturer, multi-caliber (.223/5.56mm) rifle with no serial number, an unknown manufacturer multi-caliber (.223/5.56mm) pistol with no serial number, and (1) one unknown manufacturer silencer with no serial number. SA 3997 then counted out $4500.00 and handed it to LUNA for the purchase of one (1) Aero Precision Model X15 multi-caliber (.223/5.56mm) rifle bearing serial number X155251, and one (1) one unknown manufacturer silencer with no serial number.

### D. *October 30, 2018 Undercover Controlled Purchase of Firearms from Andres LUNA*

30. On October 30, 2018, the UCs conducted an undercover controlled purchase of four (4) firearms, an unknown make, unknown model, unknown serial number (Ghost Gun), AR-Type, .223/5.56 caliber rifle, an unknown make, unknown model, unknown serial number (Ghost Gun),

**CRIMINAL COMPLAINT - CONTINUED**

AR-Type, .300 AAC caliber rifle, an unknown make, unknown model, unknown serial number (Ghost Gun), AR-Type, .223/5.56 caliber rifle, and a Glock, model 17, 9mm x 19 caliber, machine gun (pistol), bearing serial number: NAG583. The purchase was conducted at Artwork Auto, located at 844 E. 78th Ave., Denver, CO, in the Judicial District of Colorado.

31. Prior to the meeting, beginning on October, 25, 2018, SA 5115 and LUNA engaged in recorded text message communication, which continued until October 30, 2018. The purpose of this communication was to arrange an in-person meeting, where the UCs would present LUNA and his firearms supplier with the opportunity to meet the UC's cartel firearms purchaser. No arrangements were made for the UCs to purchase firearms. LUNA agreed and suggested the meeting take place at his "shop", (Artwork Auto).

32. On October 30, 2018, at approximately 12:28 pm, the UCs arrived at the front entrance of Artwork Auto and again observed a green Ford Aspire, bearing CO license plate: 532ZMK (previously identified as being registered to Jose Eduardo TRUJILLO). The UCs entered the building and immediately made contact with LUNA. Upon entering, LUNA told SA 5115 that SA 5115 was "going to be happy today". LUNA led the UCs to the garage area of the building, where TRUJILLO was present. LUNA retrieved a Glock pistol, which had been converted to a fully-automatic firearm, from the top of a tool box (where there was two more rifle cases), and handed the fully-automatic pistol to SA 3997. LUNA explained to the UCs that it was a "fully automatic" "Glock 17" and then proceeded to show the UCs a video on his cell phone, of a Glock which had been converted in the same manner as this one. It should be noted that the video was not of this particular firearm being fired, nor did it portray anyone known to be associated with LUNA. LUNA further explained that the switch on the back of the firearm allowed it to shoot in either a semi-automatic or fully-automatic mode. LUNA advised the UCs to only operate the firearm using

small magazines because if larger capacity magazines were used, it would "burn up" the "gun", "barrel" and "springs".

33. SA 5115 stated that SA 5115 did not expect LUNA to have this, nor any other firearms available to sell on this date. SA 5115 proceeded to explain the reason the UCs wanted to meet with LUNA in person was to advise him that SA 5115 had been "down south" with his "gente [people]" and that they "liked" all of the firearms and silencers that the UCs had purchased from LUNA. SA 5115 explained that as a result, they wanted to send a member of their organization, which is the member that SA 5115 dealt with and regarded as a cousin, to meet with LUNA and the person who was manufacturing the firearms (LUNA's firearms source of supply (SOS)). SA 5115 further explained that the purpose of this meeting was only a formality so that the firearms purchasers could make sure that "everything's good". LUNA stated that "he," referring to the firearms SOS, "won't talk to nobody."

34. TRUJILLO stated that they could now sell all of the firearms with the option of being "full-auto". LUNA added by stating, "We got full-auto for everything now." SA 5115 stated that another reason why his buyer wanted to speak in person was to be able to discuss prices, quantities of firearms, and how often and how many firearms LUNA and his associates would be able to produce. SA 5115 stated that they [his cartel buyers] "were going to war" and needed firearms, to which LUNA stated that they would have the "winning weapons". The UCs affirmatively acknowledged.

35. SA 5115 stated that their buyers would be interested in the fully-automatic Glock pistols. LUNA stated that those were "hard to get" and TRUJILLO and LUNA directed the attention of the UCs to the other firearms, which were two (2) separate gun cases, sitting on top of the yellow tool box. LUNA retrieved one of the firearms from the soft rifle case and TRUJILLO quickly began to remove the muzzle break, while LUNA was still holding the rifle, so that he could

show the UCs how to attach a silencer. LUNA referred to the rifle as being "hush-hush ready". TRUJILLO retrieved multiple silencers, which he had nearby. Each silencer was wrapped individually in plastic, inside separate cardboard boxes. TRUJILLO explained to and showed the UCs how each silencer could be mounted on the rifles and LUNA added that one of the silencers could even be mounted on the .300 AAC caliber rifle. LUNA retrieved another rifle, which he stated was a "stainless steel 300" and loaded an empty magazine, which TRUJILLO stated was a "forty round mag". LUNA handed the rifle to SA 3997 to examine. TRUJILLO continued to explain how the silencers were interchangeable between rifles and stated, "We've made some improvements on the threads and stuff."

36. LUNA retrieved one of the .223/556 caliber rifles from on top of the tool box and LUNA and TRUJILLO showed and explained to the UCs that the rifles were also equipped with optics, they described as "blue, red, green" "dot" optics. TRUJILLO proceeded to show the UCs a video on his cell phone of TRUJILLO test firing the .300 AAC caliber rifle. The video showed TRUJILLO firing the rifle into a stack of books on a table, while in his basement. (It should be noted that TRUJILLO had previously shown the UCs another video of him test firing a silencer, in his basement, in the same manner). TRUJILLO explained that although it sounded like the firearm was shooting one round, it was in fact firing "three bullets" in "that one sound". SA 5115 asked if the rifle was fully-automatic at this time. TRUJILLO stated that it was not, however that all of the rifles were "auto ready". TRUJILLO retrieved a small plastic baggie, containing multiple metal Auto Connectors, more commonly known as "Lightning Links".[1] TRUJILLO explained that most

---

[1] Under Title 26 U.S. Code § 5845(b), Auto Connectors ("Lightning Links") are considered machineguns, whereas the term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. Under Title 26 U.S. Code § 5861(d), it is unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record (NFRTR).

of the Lightning Links are "matched to the gun" and stated, "We'll get 'em close, and then…fine tune 'em." TRUJILLO inserted a Lightning Link into the lower receiver one of the .223/556 caliber rifles and proceeded to function test the rifle. This was performed by charging the rifle and pressing the trigger, so that one can hear the firing pin fall forward, on an empty chamber. The trigger is maintained depressed, while the rifle is charged again and when the trigger is released, there is no resetting of the trigger, as the Lightning Link has now enabled the firearm to function as a fully-automatic weapon. TRUJILLO stated that now the firearm was "fully" and that it was "fuckin' fast" and "caught" him "by surprise". The UCs affirmatively acknowledged and TRUJILLO removed the Lightning Link from the rifle and placed it back into the plastic baggie. LUNA retrieved a third .223/556 caliber rifle from on top of the tool box, which the UCs did not know was there. The UCs and LUNA negotiated the prices for the purchase of the firearms.

37. Utilizing the pre-recorded, ATF Agent Cashier Funds U.S. currency/buy money, SA 3997 then paid LUNA $1,500.00, for the purchase of the Glock, model 17, 9mm x 19 caliber, machine gun (pistol), bearing serial number: NAG583. SA 5115 then paid LUNA $4,500.00, for the purchase of three (3) firearms: an unknown make, unknown model, unknown serial number (Ghost Gun), AR-Type, .223/5.56 caliber rifle, an unknown make, unknown model, unknown serial number (Ghost Gun), AR-Type, .300 AAC caliber rifle, and an unknown make, unknown model, unknown serial number (Ghost Gun), AR-Type, .223/5.56 caliber rifle.

### E. November 8, 2018 Undercover Controlled Purchas of a Firearm (Machinegun), Silencers and Auto Connectors (Lightning Links) from Andres LUNA

38. On November 8, 2018, the UCs conducted an undercover controlled purchase from LUNA. The purchase was of three (3) unknown make, unknown model and unknown serial number silencers for $3,000.00; one (1) Surplus Ammo & Arms, model LOW15, multi-caliber, fully automatic rifle (machinegun), bearing serial number: SA08638; and two (2) Auto Connectors

**CRIMINAL COMPLAINT - CONTINUED**

("Lightning Links"), for $2,000.00. The purchase was conducted at an ATF controlled undercover location, in Denver, CO, in the Judicial District of Colorado.

39. Prior to the meeting, beginning on November 6, 2018, SA 5115 and LUNA engaged in recorded text message communication, which ensued until November 8, 2018. The purpose of this communication was to arrange for the purchase of one (1) firearm, three (3) silencers and two (2) Lightning Links, as well as for LUNA to meet with the UC's Mexican Cartel firearms buyer (ATF SA 4155). LUNA agreed to meet the UCs at the ATF controlled UC location.

40. At approximately 2:02 pm, LUNA arrived at rear garage entrance of the ATF controlled undercover location. SA 5115 opened the garage door and observed LUNA carrying a black rifle case and another black bag. SA 5115 and LUNA walked to the living room area of the UC location, where SA 3997 was present and where LUNA was introduced to SA 4155. LUNA stated that he brought the three (silencers), the "drop ins, with instructions" (Lighting Links), and the one rifle that he had "on sale". The UCs acknowledged and LUNA proceeded to remove the rifle from the soft rifle case, saying that it was a "sniper one", displaying that it had a "sniper scope" attached to it.

41. LUNA retrieved a cardboard box from the black bag he had brought, which contained the three (3) silencers and the Lightning Links. LUNA removed the silencers from the box, which were individually packaged in plastic bags, and then removed the Lighting Links, which were also individually packaged in small plastic bags. LUNA handed one of the Lighting Links to SA 5115, who then handed it to SA 4155 to examine. SA 4155 asked LUNA how they worked, and LUNA explained that the pin needed to be removed (so the lower receiver of the rifle) could be opened, "then you drop it in". SA 4155 asked LUNA what it was for and LUNA stated that it was a "sears pin" and explained that it allowed for the firearm to function in a fully-automatic capacity.

**CRIMINAL COMPLAINT - CONTINUED**

42. The UCs and LUNA began to discuss prices for the purchase of the firearm, silencers and Lightning Links. Utilizing the pre-recorded, ATF Agent Cashier Funds U.S. currency/buy money, SA 4155 paid LUNA $2,000.00, for the purchase of two (2) Lightning Links. SA 3997 paid LUNA $1,800.00, for the purchase of the Surplus Ammo & Arms, model LOW15, multi-caliber, fully automatic rifle (machinegun), bearing serial number: SA08638. SA 5115 paid LUNA $3,000.00, for the purchase of three (3), unknown make, unknown model, silencers, with no serial numbers.

43. After further discussion, LUNA eventually agreed to meet with the UCs at a later date, to provide the UCs with fifteen (15) AR-Type rifles and ten (10) Lightning Links. The UCs and LUNA then exited the front door of the UC location, where Jose TRUJILLO, (previously identified), arrived to in a 1995 gold Nissan Maxima, bearing CO license plate number: CUF142, to pick up LUNA. (It should be noted that surveillance SAs observed LUNA arrive to the UC location in this same vehicle. LUNA was dropped off in the alley way, behind the UC location. LUNA removed a black rifle case and another black bag from the trunk, before walking to the garage door of the UC location.) The UCs approached TRUJILLO, while he remained in the vehicle, curbside and greeted him. LUNA entered the vehicle and departed from the UC location with TRUJILLO.

### F. *National Firearms Act (NFA) Weapon Determination*

44. On September 8, 2018, ATF SA Alan Breneman obtained a report from the ATF Firearms Technology Criminal Branch (FTCB). The two silencers purchased during the July 25, 2018 UC purchase, were examined by Firearms Enforcement Officer (FEO) Ronald Davis. FEO Davis determined that each silencer is defined as "firearm silencer", as defined in 18 U.S.C. 921(2)(3) and 26 U.S.C. 5845(a)(7).

45. On September 25, 2018, SA Breneman obtained a report from the ATF FTCB. The two silencers purchased during the August 29, 2018 UC purchase, were examined by FEO

17

Davis. FEO Davis determined that each silencer is defined as "firearm silencer", as defined in 18 U.S.C. 921(2)(3) and 26 U.S.C. 5845(a)(7).

46. On November 14, 2018, SA Breneman obtained a report from the ATF FTCB. The Glock, model 17, 9mm x 19 caliber, machine gun (pistol), bearing serial number: NAG583, purchased during the October 30, 2018 UC purchase, was examined by FEO Davis, and determined to be a machinegun, as defined in 26 U.S.C. 5845(1)(6).

### G. National Firearms Act (NFA) Records Search

47. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) National Firearms Act (NFA) Branch is responsible for the effective administration of the National Firearms Act, 26 U.S.C. Chapter 53. In accordance with the laws and regulations, the NFA Branch maintains the National Firearms Registration and Transfer Record (NFRTR), which is the central registry of all firearms, as defined in 26 U.S.C. § 5845, with the exception of NFA firearms in the possession or control of an agency of the U.S. Government. In the registry, the NFA Branch records the firearm's identification, the date of registration, and the name and address of the person entitled to legally possess the firearm. Under Title 26 U.S.C. § 5861(d), it shall be unlawful for any person to receive or possess a firearm which is not registered to that person in the NFRTR.

48. On November 26, 2018, ATF SA Carlos Valles submitted an NFA Records Search via ATF Form 5320.22, identifiable with Andres LUNA and Jose TRUJILLO, to the ATF NFA Branch. On November 26, 2018, the ATF NFA Branch notified SA Valles that there are no NFA weapons currently registered to LUNA and/or TRUJILLO in the NFRTR.

49. Based upon the above information, your affiant believes that between the dates of on or about July 25, 2018 through November 8, 2018, Jose Eduardo TRUJILLO possessed firearm(s) which have not been registered in the National Firearms Registration and Transfer Record

CRIMINAL COMPLAINT - CONTINUED

(NFRTR), in violation of Title 26 U.S.C. § 5861(d).  These violations occurred in the District of Colorado.

I, Carlos Valles, being duly sworn according to law, depose and say that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Dated: November 26, 2018

__s/Carlos Valles_____
Carlos Valles, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to and subscribed before me this __27th__ day of November 2018.

_____
NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE

**Application was reviewed and is submitted by Celeste Rangel, Assistant United States Attorney.**